## Philadelphia County Grand Jury Investigation Case.

Argued April 22, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER and STEARNE, JJ.

*George Wharton Pepper,* with him *Michael J. Matta* and *David J. Smyth,* for petitioners.

*Wm. Barclay Lex,* for Harry K. Butcher.

OPINION BY MR. JUSTICE LINN, May 10, 1943:

This is an application for a writ of prohibition to restrain an investigation by the grand jury. The petitioners are the members of the Registration Commission, created pursuant to the Act of March 30, 1937, P. L. 115, known as "The First Class City Permanent Registration Act," amended July 31, 1941, P. L. 710, 25 PS section 623. As the Act provides for a bi-partisan commission, three commissioners belong to one political party

and two to the other. All the members, without respect to party, joined in the petition and appeared by counsel. When the petition was presented, a rule was granted on Judge OLIVER, as the presiding Judge in the Quarter Sessions of Philadelphia for April Term, 1943; on John H. Maurer, District Attorney; and on Henry M. Raab, foreman of the grand jury, to show cause why the prayer of the petition should not be granted. In response to the rule, answers were filed by the Judge, by the District Attorney, and by Harry K. Butcher, who had delivered to Judge OLIVER a memorial which had induced the action petitioners seek to restrain.

The Term of the Quarter Sessions began on Monday, April 6, 1943. It appears that several days before that date, Harry K. Butcher delivered to Judge OLIVER a memorial concerning the administration of the Permanent Registration Act by the Commission. At the opening of the Term on April 6th, Judge OLIVER charged the grand jury generally. At the conclusion of the general charge, he dealt with the memorial, and, in the course of his charge, said: "The members of the Registration Commission of the City of Philadelphia are charged with having wilfully neglected or refused to perform their duty as such members, as defined by the First Class City Permanent Registration Act of March 30, 1937, P. L. 115, which states that any commissioner who so fails or refuses to perform his duties shall be guilty of a misdemeanor. If all or any of the members of the Registration Commission have wilfully neglected or refused to perform his or their duties as such members, such neglect or refusal is unlawful and criminal."

On April 7th, he again instructed the grand jury and stated that on the day before, he had been mistaken in quoting sections of the statute as originally approved instead of quoting from the amended Act. He then also said, inter alia, "In justice to the Registration Commission I want to say this to you, that their job is, of course a difficult job, and that it would be utterly impossible

for them to have their records in one hundred percent condition. That is because the city is naturally a very live unit of people and that they are constantly moving, constantly dying, coming into the city and going out of the city and moving from one location to another. So you must not look for or expect perfection. The essence of the charge before you is that the failures have been so great as to lead to a reasonable conclusion that they are wilful. Now, that is the test, whether these records are in such condition as to indicate to you a wilful neglect or failure or refusal to perform the duties imposed upon the Commission." He impounded the Commission's records in 67 election divisions.

The power of the Quarter Sessions, on a proper showing, to direct a grand jury to investigate violation by the commissioners of the registration law, is not questioned; the single question on this review is whether a proper case appears for the investigation ordered.

It has long been the rule in the Quarter Sessions of this county, that the exercise of the power to direct or to refuse to direct such investigation rests in the judicial discretion of the court. In *The Matter of the Memorial of the Citizens' Association,* 8 Phila. 478 (1870), in dealing with a memorial, much more detailed and specific than that now before us, the subject was considered at length by two very able judges, President Judge ALLISON and Judge PAXSON. In declining to order the investigation, they declared this general principle: "The exercise of this power rests in the sound discretion of the Court; and when adequate legal remedies exist by statute, by ordinance, or by indictment at common law, the Court will not generally move until these remedies, or some of them, have been invoked." In the course of the opinion, they said: ". . . this power, which is a most delicate one, is never exercised unless under urgent necessity or when, from the peculiar circumstances of the case, the public interest would suffer from the delays incident to ordinary forms of law." Similar language is used by

President Judge RICE in *Commonwealth* v. *Klein*, 40 Pa. Superior Ct. 352, at p. 357. A few years ago in *McNair's Petition*, 324 Pa. 48, 61, 187 A. 498, 504 (1937), this court, in a unanimous judgment, laid down the rule that "A grand jury's investigation cannot be a blanket inquiry to bring to light supposed grievances or wrongs for the purpose of criticizing an officer or a department of government, nor may it be instituted without direct knowledge or knowledge gained from trustworthy information that criminal conspiracy, systematic violations of the law or other criminal acts of a widespread nature prevail, and at least one or more cognate offenses should exist on which to base a general investigation."

A majority of the members of this court agree that the record shows that the challenged action of the learned judge was a manifest abuse of discretion and that the petitioners are entitled to the relief prayed for.

1. In reviewing the exercise of discretion complained of, it is significant that after counsel for the memorialist had outlined the subject to the court below the District Attorney, a competent and experienced public officer, stated: "From the allegations that have been made here, if there are any acts at all, they are not acts of criminality, but at most they could only be regarded as acts of oversight, or as acts of negligence." He concluded by saying, "I have an open mind on this subject, but to be quite frank with Your Honor, I do not see that this is the subject of a Grand Jury investigation." [1]

2. We next must note a fact of more significance; it appears in the answer of the learned judge. We infer from it that the learned judge had misapprehended the

---

[1] At that time the District Attorney had not seen the memorial; he based his remarks on what counsel for the memorialist stated to the court prior to the charge to the grand jury. In his answer, the District Attorney states that when the court below impounded the records of the commission he assigned two of his assistants "to act for him and to aid and assist the grand jury in accordance with the directions of the court."

memorial and that his action was influenced by that misapprehension. The petitioning Commissioners were appointed on August 1, 1941, although Mrs. McNeil had served under a prior appointment since June, 1939. Four of the petitioners had, however, not been members before. In his answer, made in support of the order complained of, the learned judge said "That the said memorial contained detailed allegations of neglect of duty on the part of the Registration Commissioners after irregularities had been called to their attention, and an allegation that the failure and neglect of the Commissioners have extended over a period of three or four years." It seems clear to us that commissioners who took office August 1, 1941, much less than two years before the memorial was filed, cannot possibly be charged with wilful default for the conduct of Commissioners not in office.

3. In examining the memorial, it is necessary to bear in mind that the Act makes it a misdemeanor for any commissioner upon whom a duty is laid by the Act, wilfully to neglect or refuse to perform his duty. The fourth paragraph seems to be a summary of the memorial: "4. On the basis of the examinations and investigations which your petitioner has made, he does aver upon information and belief that said Registration Commissioners have been and are in default in the performance of their statutory duties, and that it is necessary and desirable that a public body forthwith make a full and complete investigation in order that it may be duly ascertained whether crimes have been committed, to the end, that if they have, appropriate action may be taken in respect thereto." Quite obviously, such a general statement that the memorialist has been informed and believes that the Commissioners ". . . have been and are in default in the performance of their statutory duties" is not sufficient to justify a grand jury investigation when challenged as it is here. As the legislature has provided that wilful neglect or refusal to perform the statutory duties

shall constitute a misdemeanor, not every default constitutes a crime; a default may result from mere negligence or from circumstances beyond the control of the Commissioners or it may be wholly accidental. In the administration of a permanent registration system on the large scale contemplated by the Registration Act, mistakes are bound to occur. The legislature recognized that fact in making a distinction between such non-criminal defaults and the conduct for which it provided punishment by specifying that to constitute a misdemeanor the default must be wilful.

The learned judge also recognized this but failed to give it effect; on the second day of the Term when he brought the grand jury back, he stated to them that "In justice to the Registration Commission, I want to say this to you, that their job is, of course a difficult job, and that it would be utterly impossible for them to have their records in one hundred percent condition." As showing the magnitude of the official undertaking, we note that at the end of 1942 there were 1,326 election divisions in the county and 1,039,438 registered voters. Over 1,000,-000 registration affidavits alone, not to mention voter's certificates, were on file. These Commissioners took office August 1, 1941, with the duty of being ready for the primary election to be held within six weeks (September 9, 1941) and the general election about two months later. The record also shows that the number of votes recorded in the four elections held in 1941 and 1942 were "September 9, 1941—272,000; November 4, 1941—628,000; May 19, 1942—350,000; November 3, 1942—635,000."

The memorial makes no direct charge that the Commissioners were guilty of wilful default with respect to any specified circumstance, a defect which the memorialist recognizes in paragraph 4, quoted above, by saying that it is "desirable" to have an "investigation in order that it may be duly ascertained whether crimes have been committed. . . ." It refers to the section of the Act making wilful default a misdemeanor and we can only con-

clude, and we think the learned Judge should have concluded, that wilful default was not charged because the memorialist had no evidence to support the accusation.

The memorial [2] refers to three general classes of duty: (1) of comparing the voters' signatures on registration affidavits with those on the voting certificates; (2) of purging the lists by eliminating the names of persons no longer qualified to vote; (3) of dealing with voters claiming assistance. These duties are prescribed with considerable detail in more or less complicated provisions of the statute. We shall refer to them briefly. After an election the voters' certificates must be returned to the Commission and thereafter constitute one of its records. Some idea of the number of documents that must be dealt with may be obtained by keeping in mind the number of votes cast at the elections stated above. The voter's signature must be compared with that appearing on his or her registration certificate. The memorial suggests that such comparison was not made and, to support the suggestion, states that the blocks of voters' certificates were taped and that the tape had not been removed. At the argument a sample block was produced; the adhesive tape appeared to be slightly more than an inch wide and passed from the bottom to the top of the block at one end and could be detached and reap-

---

[2] In the brief filed on behalf of the memorialist it is said that "The defaults charged . . . fall into three classifications. First, the failure of the Registration Commissioners to compare the signatures supposed to have been made by voters at certain elections with their signatures in the district binders, thereby failing to unearth and report to the proper authorities, that which was afterwards ascertained, that in certain specified divisions a substantial number of fraudulent votes had been cast. Second, the failure to keep the lists of voters purged of the names of persons who had removed from the division, or died, or were otherwise not qualified to vote. Third, the failure to check assistance affidavits, thereby making it possible for certain voters not entitled to assistance to receive it, and vice versa."

plied at will. This demonstration was not challenged by the respondents and would indicate that the circumstantial evidence of suggested default was insignificant. Reference was made to fraudulent voting in some districts as a result of forged certificates, but it appeared that, with evidence furnished by the Commission, the District Attorney had procured indictments against those charged, and, in the cases that had been tried, had obtained pleas of guilty or convictions.

Provision is made for the purging of the lists. The memorial averred that in certain divisions votes had been cast in the name of persons who had moved from the district. It is the duty of voters moving from one place to another in the city, and of public service companies, of real estate brokers and of others, to give notice of removals to the Commission to aid in purging the lists: 25 PS section 623, as amended. Obviously, unless the Commission was given notice of the removals in question, the commissioners were not in default; it is not suggested that the Commission had been notified of the removals prior to the election at which the votes were cast. Section 31 (a) of the Act of March 30, 1937, P. L. 115, provides (25 PS section 623-31) that the "registrar of vital statistics of every registration district, . . . shall report, in writing, at least weekly, to the registration commission, the deaths of residents of the city except residents less than twenty years of age. Said written report shall contain the full name of the decedent, his residence address, the date of his birth, if available, and the date of his death. The commission shall forthwith cancel the registration of each registered elector so reported." There is no averment that the commissioners have wilfully neglected to cancel the registration of every voter so reported to them.[3] With respect to the

---

[3] The Annual Report for 1942, in the record, states that 8,484 deceased persons were stricken from the registration records in that year.

purging of the lists, an interesting fact was stated to the court at the argument. The memorial averred that between the May and November elections in 1942, a door-to-door canvass had disclosed that about 14% of the registrants checked had either moved or died since registering; the total given for the divisions in question was 2,552 names. While the statute does not require the Commissioners to make a door-to-door canvass, we were informed that in February, 1943, as part of the purging of the lists, the Commissioners began an optional mail check of registration which, at the time of the argument, had not been completed; the results of the action of the Commission, as shown by its records, was that instead of striking off 2,552 names, the number suggested by the memorial, the commission in fact was striking 3,662 names. This fact, developed after the grand jury was charged, was of course not known to the court below, but it is a record fact which, not having been challenged, we must consider.

Coming now to the third complaint, "The failure to check Assistance Affidavits," it is to be noted that the statute provides: "When the commission shall ascertain that any elector who has declared his need for assistance is no longer illiterate, or no longer suffers from the disability stated by him, it shall cancel on his registration affidavit the entry relating to illiteracy or physical disability which authorized him to have assistance, and shall forthwith notify such elector by mail of this action." Section 21 of the Act of July 31, 1941, P. L. 710, amending section 30 of the Act of March 30, 1937, P. L. 115, 25 PS section 623-30 (f). The suggestion of wilful default in the performance of the duty with respect to assistance affidavits is subject to the same complaint made with respect to the others. There is no averment that the Commission failed to cancel the authority to have assistance after the fact that a voter no longer needed it had been ascertained. We were informed at the argument that more than 5,000 such cancellations had been made during 1942.

Judicial discretion requires action in conformity with law upon the facts and circumstances before the court after hearing and due consideration. In *Osborn* v. *U. S. Bank,* 9 Wheat. 738, 866, Chief Justice MARSHALL said: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." See, also, *Dauphin Co. Grand Jury Proceeding,* 332 Pa. 358, 364, et seq., *Maloney* v. *Stahlnecker,* 341 Pa. 517, 19 A. 2d 162. The memorial presented no case within the rule quoted earlier in this opinion from *McNair's Petition,* 324 Pa. 48, 187 A. 498, and the other two cases quoted. We agree that the learned judge acted in perfect good faith, but we think he was mistaken.

The prayer of the petitioners is granted, and it is directed that a writ of prohibition issue; we assume that it will be unnecessary to serve the writ.

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

I dissent from the majority opinion as I find in this record no legal justification whatsoever for this court to issue a writ prohibiting the court below from proceeding with the Grand Jury investigation it has ordered. The writ of prohibition is referred to by jurists and textbook writers as an "extraordinary writ", and as such it is aptly named for it has been issued by courts only on rare and extraordinary occasions to meet extraordinary emergencies. How extraordinary this writ is is evidenced by the fact that during the 222 years existence of the Supreme Court of Pennsylvania, during which period there probably have been several thousands of Grand Jury

investigations, this court has prohibited a grand jury investigation only once.

In that case *McNair's Petition*, 324 Pa. 48, 187 A. 498, this court issued a writ prohibiting a proposed investigation "into the conduct of the magisterial system in the City of Pittsburgh". We said (p. 62) "As it was admitted there was no bad faith and the mistake [of the magistrate whose act precipitated the investigation] was an error of judgment, neither the district attorney nor the Grand Jury under such conditions could impose criminal liability . . . The most important consideration was the propriety of the disposition of these cases by the magistrate, and that involved the exercise of judicial discretion as to the proper course to be pursued . . . The use of the Grand Jury as an inquisitorial body is to be limited to the investigation of criminal conduct and is not to be extended to the review of judicial discretion". The substance of the court's decision in that case is that a grand jury cannot investigate matters which are admittedly *non*-criminal in nature. As a writer in the Michigan Law Review, Vol. 35, p. 1020, aptly said: The *McNair* case in Pennsylvania "may easily be explained as an attempt to order investigation of *non*-criminal matters". A grand jury would be out of its jurisdiction if it attempted by order of court to investigate the lawful business methods of a department store, or the non-criminal alleged inefficiency of a street-cleaning department of a city government. A grand jury is an arm of the criminal courts and criminal courts must confine their activities to criminal matters. In the instant case, Judge OLIVER properly in charging the Grand Jury, correctly confined the scope of the proposed investigation. He said: "The petition makes charges of unlawful conduct on the part of certain persons who are holders of official positions under the government of the State. It is to such alleged unlawful conduct by those persons,— that is, conduct contrary to our criminal laws,—that your inquiry must be confined, as your investigation

must concern itself solely with violations of the criminal laws of this Commonwealth."

Of course, the Court of Oyer and Terminer and Quarter Sessions of the Peace of Philadelphia County, for which Judge OLIVER acted, has jurisdiction of matters involving alleged violations in that County of the penal laws of Pennsylvania. Since Judge OLIVER was *not* exceeding his jurisdiction in ordering this grand jury to investigate allegedly criminal acts of public officers, where is there any legal justification for the writ of prohibition ordered in this case? I find this entire record and all the arguments made to stop this investigation utterly barren of any such justification. As the Supreme Court of the United States in an unanimous opinion in *Smith* v. *Whitney,* 116 U. S. 167, at page 176, said: "A writ of prohibition is never to be issued unless it clearly appears that the inferior court is about to exceed its jurisdiction." The rule thus stated by the United States Supreme Court has been constantly and consistently adhered to by that court and by the highest courts of every state of the Union. I can find no precedent anywhere for the granting of a writ of prohibition in a case like the one now before us. Neither in the majority opinion of this court nor in the argument of counsel has there been shown a single instance where an appellate court has granted a writ of prohibition restraining another tribunal in a matter in which the latter had jurisdiction. That the court for which Judge OLIVER acted in ordering this investigation had jurisdiction of the subject matter is incontestable.

In 1938 the Court of Quarter Sessions of Dauphin County ordered a Grand Jury investigation of charges against State officials and others. The court was asked to issue a writ of prohibition. It, (with the writer of this opinion dissenting) stayed the investigation until the District Attorney presented an amended petition. See *Dauphin County Grand Jury Investigation,* 332 Pa. 289, 2 A. 2d 783. After the amended petition was filed

this court said: "While we are all impressed with the sincerity of the Governor's statements, the only tribunal under the Constitution that can properly dispose of these issues of fact is the Court of Quarter Sessions of Dauphin County. We cannot invade its constitutional powers . . . The writ of prohibition is refused."

On June 30, 1938, the Pennsylvania Legislature passed an Act (No. 1, Act of 1938, Special Sessions) which was approved on the same day by Governor Earle, making it "unlawful for any court of Oyer and Terminer and general jail delivery or court of Quarter Sessions, or any judge of such courts, to order an investigation by a grand jury of charges against the Governor, or any other civil officer who is liable to impeachment, if the offenses charged would constitute or involve misdemeanor in office," unless under certain circumstances which need not be recited here. This Act was declared unconstitutional by this Court. See *Dauphin County Grand Jury Investigation No. 2*, 332 Pa. 342, 2 A. 2d, 802, 804. In that case Mr. Justice LINN, speaking for this Court, said: "The right of the people to be protected against crime and their opportunity of ascertaining and punishing the criminal . . . is therefore not only as fully recognized in the constitution as the power to impeach civil officers is recognized . . ." He also said, on p. 357: "There can be no doubt that the delegation to the House of Representatives of the sole power of impeachment of civil officers does not in express words, and cannot be said to have been intended to, confer authority on the legislature to take from the quarter sessions its immemorially exercised power to use the grand jury in the respect challenged." In the instant case "the respect challenged" was a proceeding with the grand jury investigation ordered by the Dauphin County Court. This legislative attempt to interfere with the centuries old investigative functions of grand juries met with such universal condemnation that one of the first acts of the 1939 Legislature was to repeal the above Act of

July 30, 1938. The repealing act was No. 9 and is found on page 9 of the Pamphlet Laws of 1939. In approving the repealing Act, Governor James said: "This bill repeals an act which already has been declared unconstitutional. To repeal such an act after it has been invalidated is not a usual procedure and in my judgment not at all a necessary one. However, since the passage of this act seems to be the only method by which the 1939 Legislature has within its power to make clear that it is entirely out of sympathy with the principles that led to the original enactment of this bill, and since the Legislature has chosen thus to express its sentiments, I am approving this repealer."

The American and English Encyclopedia of Law (2d Ed.), Vol. 23 at p. 200, sums up the law applicable to writs of prohibition as follows: "Where the inferior court has jurisdiction of the matter in controversy, prohibition will not lie. The writ does not lie to prevent a subordinate court from deciding erroneously, or from enforcing an erroneous judgment in a case in which it has a right to adjudicate, and it matters not whether the court below has decided correctly or erroneously; its jurisdiction of the matter in controversy being conceded, prohibition will not lie to prevent an erroneous exercise of that jurisdiction. The exercise of power which it is sought to prohibit must be wholly unauthorized by law. Mere errors or irregularities in the proceedings which do not go to the jurisdiction will not be considered upon an application for a writ of prohibition. The sole question is as to the jurisdiction of the inferior court to take the proposed action, and the merits of the action will not be considered."

There is nothing on which the law is more clear and the authorities more completely in accord than on the nature of a writ of prohibition and the unusual circumstances under which it can be issued by an appellate tribunal. 50 Corpus Juris, sec. 3, p. 655 also sums up the law when it says: The writ of "prohibition, at com-

mon law, was a remedy against encroachment of jurisdiction. Its office was to restrain subordinate courts and inferior judicial tribunals from extending their jurisdiction. . . . The courts have almost universally preserved its original common-law nature, object, and function." Sec. 4, "Prohibition is an 'extraordinary' remedy, granted usually only in cases of necessity, and not for grievances which may be redressed by ordinary proceedings at law or in equity. It is not a remedy in 'the ordinary course of law' ". Sec. 10, "The writ of prohibition should be used with caution and forbearance for the furtherance of justice, and for securing order and regularity in and among inferior tribunals, and it should issue only where the absence or excess of jurisdiction is clear."

In *Ex Parte Oklahoma by Haskell, Governor,* 220 U. S. 191, the Supreme Court of the United States in a unanimous decision expressed by Chief Justice WHITE, denied a writ of prohibition and in doing so referred to that writ as "an extraordinary remedy". The substance of the decision is that the writ should not issue where the court has jurisdiction of the cause and even if the court has no jurisdiction the writ should not issue if there is another legal remedy by appeal or otherwise.

In *People ex rel. Childs* v. *Extraordinary Trial Term,* 228 N. Y. 463, 127 N. E. 486, the Court of Appeals of New York said: "The writ of prohibition is an extraordinary remedy for unusual cases, resorted to, not to correct errors, but in aid of substantial power . . . The conclusion is inevitable that if no error prejudicial to relator's rights would appear at the end of the trial, to be corrected on appeal, the trial itself may safely be proceeded with. No injury now exists, nor is apprehension of injury enough to sustain the writ . . . It follows that the unusual circumstances do not exist which call for intervention by [the writ of] prohibition when a tribunal is about to concern itself with matters not within its jurisdiction."

In *Alexander* v. *Crollott,* 199 U. S. 580, the United States Supreme Court said, "Although a writ of prohibition will lie to an inferior court, when it is acting manifestly beyond its jurisdiction, such writ will issue only when there is no other remedy," citing numerous cases.

In *Zinn* v. *District Court,* 114 N. W. 475, the Supreme Court of North Dakota said a writ of prohibition was "not a writ of right, but is available only when the inferior court, body, or tribunal is about to act without any jurisdiction or in excess of jurisdiction". "The writ of prohibition is not available to arrest further proceedings by a trial court on an indictment found by a grand jury irregularly drawn, summoned, and impaneled, . . . if erroneous rulings are made no question of the jurisdiction of the subject matter nor of the person is presented which can be reviewed through a writ of prohibition." The Court cited Spelling on Extraordinary Relief, Sec. 1716, as follows: "But the writ of prohibition lies only when the inferior court proposes to exceed its lawful jurisdiction as to the person or subject-matter, or in the enforcement of its rulings in a manner or by a means not intrusted to its judgment or discretion." The Court also quotes High on Extraordinary Relief, Sec. 765, as follows: "The writ of prohibition 'being a prerogative writ, it is to be used, like all other prerogative writs, with great caution and forbearance for the furtherance of justice, and to secure order and regularity in judicial proceedings, when none of the ordinary remedies provided by law are applicable. Nor should it be granted except in a clear case of want of jurisdiction in the court whose action it is sought to prohibit.' "

In *State ex rel. Pabst* v. *Circuit Court,* 199 N. W. 213, quoting from *In Petition of Pierce-Arrow Motor Car Co.,* 143 Wis. 282, 127 N. W. 998, the Supreme Court of Wisconsin in an opinion by Chief Justice Winslow said: ". . . This jurisdiction [to issue a writ of prohibition] is not to be exercised upon light occasion, but only upon some grave exigency; the writs by which it is ex-

ercised will not be used to perform the ordinary functions of an appeal or writ of error; . . . the results [of the proceedings sought to be prohibited] must be not only prejudicial but must involve extraordinary hardship; the remedy by appeal or writ of error must be utterly inadequate; and the application for the exercise of the power of superintending control must be speedy and prompt." In *State ex rel. Pabst* v. *Circuit Court,* 199 N. W. 213, the Supreme Court of Wisconsin, after quoting the foregoing, said: "Those principles have been affirmed in a number of cases since that time."

In *State ex rel. De Puy* v. *Evans,* 60 N. W. 433, where a writ of prohibition was asked for to restrain a magistrate from proceeding in a criminal case because the warrant was void, the Supreme Court of Wisconsin denied the writ, per Justice CASSODAY, "To allow such writ in such a case . . . would be a complete revolution in criminal procedure. So this court has repeatedly held . . . such writ issues only to restrain the acts of a court or other inferior tribunal exercising some judicial power which it has no legal authority to exercise at all," citing numerous cases.

In *State ex rel. Harkness* v. *Gleason,* 119 N. E. 9, the Supreme Court of Indiana said of writs of prohibition: "It is not the policy of courts to exercise such power on slight occasion, but only in special emergency cases to prevent great impending present injury . . . The power of superintending control [by granting a writ of prohibition] will not be exercised in the place of appellate jurisdiction or where another remedy exists."

In *People ex rel. Hummel* v. *Trial Term,* 184 N. Y. 30, 76 N. E. 732, the Court of Appeals of New York said that "the writ [of prohibition] does not issue as a matter of right, but only in the sound discretion of the court in cases of supreme necessity, where the grievance cannot be redressed by ordinary proceedings at law or in equity or by appeal."

To the same effect is the opinion in *People ex rel. Livingston* v. *Wyatt,* 186 N. Y. 383, 79 N. E. 330.

In *Ex Parte United States, as owner of Nineteen Barges &c.,* 263 U. S. 389, the Supreme Court of the United States said: "the writ [of prohibition] is a remedy against unwarranted assumptions of jurisdiction and that, besides, the condition of its issue is that the party attacking the jurisdiction has no other remedy. In other words, the writ cannot be made to perform the office of an appeal or writ of error."

In *State v. Duffy,* 114 Ohio St. 702, 152 N. E. 656, 657, the Supreme Court of Ohio said: "The proper function of the 'writ of prohibition' is to restrain inferior courts from exceeding their jurisdiction."

In *Ex Parte Jones,* 160 S. C. 63, 158 S. E. 134, 137, 77 A.L.R. 235, the Supreme Court of South Carolina said: "Writ of 'prohibition' only lies to prevent encroachment, excess, usurpation, or improper assumption of jurisdiction on part of inferior tribunal or to prevent great outrage on general principles of law and procedure."

In *State v. Young,* 29 Minn. 474, 523, 9 N. W. 737, 738, the Supreme Court of Minnesota said: "A writ of prohibition issues usually to courts to keep them within the limits of their jurisdiction, but it may also issue to an officer to prevent the unlawful exercise of judicial or quasi judicial power. Three things are essential to justify the writ: (1) That the court, the officer, or person is about to exercise judicial or quasi judicial power; (2) that the exercise of such power by such court, officer, or person is unauthorized by law; (3) that it will result in injury for which there is no other adequate remedy."

The majority opinion quotes an excerpt from an opinion in re: *Matter of Memorial of the Citizens Association,* 8 Phila. 478. The two judges whose language is quoted were then serving as judges of the court of Oyer and Terminer and Quarter Sessions. They declined, as they had a right to do, to order a grand jury investigation of certain matters, and when they said that "the exercise of this power rests in the sound discretion of the

court" they merely stated a long-established principle of law. In the present case the exercise of power to order a grand jury investigation rested in the sound discretion of Judge OLIVER. He could have declined to order this investigation had he been so minded. There is nothing in the excerpt cited in the majority opinion which shows that *this court* is justified in interfering with Judge OLIVER'S exercise of his judicial discretion in ordering this investigation. This court never before prohibited a grand jury from investigating allegedly criminal conduct on the part of public officials or others. It refused to do so in the *Dauphin County* cases, supra. For centuries in England and here, to the present day, grand juries have investigated alleged violations of law when instructed to do so by the judge who had them in charge. Blackstone, Vol. IV, p. 303, says: "The grand jury are instructed in the articles of their inquiry by a charge from the judge who presides upon the bench."

The original function of a grand jury was to make investigations of offenses committed in its vicinage. Forsythe, "Trial by Jury" p. 215, says: "When the justices *in eyre* paid their periodical visits to the counties they caused to be summoned before them twelve knights or other good and lawful men for each hundred, and charged them upon their oaths to inquire respecting crimes and offenses committed within their respective hundreds so that they might be ready to present to the court the suspected persons at a future day fixed by the justices. Three jurors were the representatives of and substitutes for the *fama patriæ,* or public rumor, by which in old times when a man was assailed he was said to be *mala creditas* and was thereupon arrested and put upon his trial." Thompson & Merriam on Juries, Sec. 463, 7, says: "An accusing body . . . has been known to the law from the time of Henry III . . . Each hundred had its own accusing body. No witnesses were examined. Presentments were made upon the knowledge of the jurors in respect to any such violations of the law as

were the subject of their inquiry." United States Supreme Court Justice JAMES WILSON, one of the fathers of the Federal Constitution, said (2 Wilson's Works 213, 214): "It has been alleged, that grand juries are confined, in their inquiries, to the bills offered to them, to the crimes given them in charge, and to the evidence brought before them by the prosecutor. But these conceptions are much too contracted: they present but a very imperfect and unsatisfactory view of the duty required from grand jurors, and of the trust reposed in them. They are not appointed for the prosecutor or for the court: they are appointed for the government and for the people: and of both the government and people it is surely the concernment, that, on one hand, all crimes, whether given or not given in charge, whether described or not described with professional skill, should receive the punishment, which the law denounces; and that, on the other hand, innocence, however strongly assailed by accusations drawn up in regular form, and by accusers marshalled in legal array, should, on full investigation, be secure in that protection, which the law engages that she shall enjoy inviolate. The oath of a grand juryman —and his oath is the commission, under which he acts— assigns no limits, except those marked by diligence itself, to the course of his inquiries: why, then, should it be circumscribed by more contracted boundaries? Shall diligent inquiry be enjoined? And shall the means and opportunities of inquiry be prohibited or restrained? The grand jury are a great channel of communication, between those who make and administer the laws, and those for whom the laws are made and administered. All the operations of government, and of its ministers and officers, are within the compass of their view and research. They may suggest public improvements and the modes of removing public inconveniences: they may expose to public inspection, or to public punishment, public bad men, and public bad measures."

Chief Justice AGNEW, in his dissenting opinion in *Hartranft's Appeal,* 85 Pa. 433, at page 453, said: "It

[the grand jury] is one of the boasted bulwarks of English liberty handed down to us, and protected by the Declarations of Rights."

The majority opinion discusses the memorial of Harry K. Butcher, and says that "such a general statement that the memorialist has been informed and believes that the Commissioners '. . . have been and are in default in the performance of their statutory duties' is not sufficient to justify a grand jury investigation when challenged as it is here." The answer to that is that a judge can lawfully order a grand jury investigation *without any memorial or averments of any kind from anybody about unlawful acts, and customarily does so.* From the writer's own experience as a judge of the courts of oyer and terminer and quarter sessions for nearly eleven years, and from observation, he knows that many grand jury investigations in Pennsylvania have been ordered by judges on mere rumors or on newspaper articles. There is no authority anywhere for the proposition that in order to justify a grand jury investigation there must be specific averments of the commission of crimes. The very purpose of a grand jury investigation is to ascertain *whether or not there have been crimes committed.* In a case in the Federal courts of Pennsylvania about a decade ago *In re Grand Jury Proceedings,* 4 Fed. Supp. 283, Judge KIRKPATRICK declared, after citing a decision of the United States Supreme Court (*Hale* v. *Henkel,* 201 U. S. 43), that it was "settled beyond all question that in the federal courts an investigation by the grand jury need not be preceded by any definition whatever of the crimes to be investigated or the persons against whom an accusation is sought." In other words, no man has a right to demand a bill of particulars before he is investigated.

To hold that a court cannot order a grand jury investigation unless both the offenses and the offenders are identified in advance is exactly tantamount to a decision that grand jury investigations should be ordered only when they have no purpose to serve. When the offence

and the offenders are known it is time to swear out warrants. What the majority now prescribe as *conditions precedent* to a grand jury investigation have been for ages the *fruits* of grand jury investigations. In *Hendricks* v. *United States*, 223 U. S. 178, 184, the Supreme Court of the United States said that the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning.

The majority opinion comments also on the fact that the District Attorney of Philadelphia County stated to Judge OLIVER in open court that "from the allegations that have been made here, if there are any acts at all they are not acts of crime". As the majority opinion points out in the footnote, *at that time* the District Attorney had not seen the memorial. Whether the District Attorney wanted this investigation or not is immaterial. A grand jury investigation can be ordered even if a district attorney is opposed to it. In the present instance the district attorney's position is correct. He neither requests nor opposes the investigation. Like Judge OLIVER, he accuses and prejudges nobody. He states in his answer that he "submits himself to such order as the Court may make with respect to whether he shall continue to aid and assist the Grand Jury in making such investigation".

The majority opinion also says that there must be noted "a fact of more significance; it appears in the answer of the learned judge. We infer from it that the learned judge misapprehended the memorial and that his action was influenced by that misapprehension". The court adds: "It seems clear to us that commissioners who took office August 1, 1941, much less than two years before the memorial was filed, cannot possibly be charged with wilful default for the conduct of Commissioners not in office." The answer to this is that Judge OLIVER, in ordering this investigation, "charged" no commissioner or anybody else with "wilful default" or anything else. He made clear that the purpose of the investiga-

tion was to ascertain *whether or not* there had been any violations of the criminal laws of this Commonwealth by the members of the Registration Commission. He said: "In the interest of the people of this city it is highly important that there be had promptly a careful, searching, and impartial investigation and consideration of these charges, to the end that, if they are found to be true, the guilty may be indicted, tried, and punished, and, on the other hand, if they are found not to be true, those against whom the charges have been made may be exonerated." He also correctly added: "In this Commonwealth the court, acting upon a petition as presented here, or upon facts from any trustworthy source, may direct investigation by the grand jury or matters of general public importance which, from their operation in the entire community, might, if permitted to continue, endanger public safety, morals or health, demoralize the personal security of members of the public or permit systematic criminal acts and misdemeanor in office on the part of public officers."

In making this statement Judge OLIVER took a position which was supported by one of the State's greatest judges, President Judge RICE of the Superior Court, who thirty-four years ago, in *Commonwealth* v. *Klein,* 40 Pa. Superior Ct. 352, said: "Criminal courts of their own motion call the attention of grand juries to and direct the investigation of matters of general public import, which, from their nature and operation in the entire community, justify such intervention." This principle was reiterated as recently as 1935 in *Com.* v. *Hackney,* 117 Pa. Superior Ct. 519. In *Frisbie* v. *U. S.,* 157 U. S. 160, the Supreme Court of the United States said: "In this country . . . [it] is for the grand jury to investigate any alleged crime, no matter how or by whom suggested to them, and after determining that the evidence is sufficient to justify putting the party suspected on trial, to direct the preparation of the formal charge or indictment."

Sir William Blackstone defined a writ of prohibition as follows: "A writ issuing properly out of the court of

king's bench, being the king's prerogative writ . . . directed to the judge and parties of a suit in any inferior court, commanding them to cease from the prosecution thereof, upon a suggestion that either the cause originally, or some collateral matter arising therein, did not belong to that jurisdiction, but to the cognizance of some other court": Blackstone Vol. 3, Ch. 112. During the nearly two centuries which have elapsed since Blackstone described the purposes of this extraordinary writ it has never been used, until *in this case,* to stay the processes of a court which had jurisdiction of the subject-matter of its official inquiry. That the court which ordered this investigation had jurisdiction in the matter is, of course, undisputed and indisputable. The jurisdiction of a court means its authority to act judicially, as an agency of the state, on a matter brought before it. The Supreme Court of Vermont said in *Perry* v. *Morse,* 57 Vt. 509, 513: " 'Jurisdiction' is the power of a court or a judge to entertain action, petition, or other proceeding." In *Benedict* v. *Clarke,* 123 N. Y. S. 964, 966, 139 App. Div. 242, the Appellate Division of the Supreme Court of New York said: "A judicial officer has 'jurisdiction' when he has power to inquire into the facts, to apply the law, and to pronounce the judgment." In *Morrow* v. *Corbin,* 122 Tex. 553, 62 S. W. 2d 641, the Supreme Court of Texas said: " 'Jurisdiction' of particular court is that portion of judicial power which it has been authorized to exercise by Constitution or by valid statute."

I agree with the majority opinion that "judicial discretion requires action in conformity with the law". It is because it is clear to me that the issuance of a writ of prohibition in this case is *not* "in conformity with law" as the authorities cited and countless others that could be cited conclusively demonstrate, that I am opposed to it and record my opposition in this dissenting opinion.

Mr. Justice HORACE STERN and Mr. Justice PARKER concurred in this dissent.