Hamilton Appeal.

Argued January 9, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

 reargument refused May 21, 1962.

*Stanley M. Greenberg* and *Edward R. Becker,* with them *William A. Meehan,* and *John J. Poserina, Jr.,* for appellants.

*David Berger,* City Solicitor, with him *Murray C. Goldman,* Assistant City Solicitor, *James L. Stern,* Deputy City Solicitor, and *Levy Anderson,* First Deputy City Solicitor, for appellees.

OPINION BY MR. JUSTICE EAGEN, April 24, 1962:

The appellants, as residents and taxpayers of the City of Philadelphia, petitioned the Court of Quarter Sessions of Philadelphia County to convene a special grand jury to investigate alleged corruption in the city government. The court refused the request and dismissed the petitions. From that order, this appeal is prosecuted.

Following the entry of the appeal, a motion to quash was filed. Because of the nature of the proceedings and its serious public connotations, the Court decided to deny the motion to quash and hear the matter out. Counsel for all parties were granted the right to appear and argue thoroughly all of the issues involved. Now, after a more studied consideration of the matter, we are convinced that the appeal does not lie and that the motion to quash must prevail.

This is not an adversary proceeding. The appellants appeared before the court below to inform it of facts which, in their opinion, indicated the necessity for the investigation requested. The only function of the appellants was one of presenting facts and suggesting to the court that an investigation be ordered—nothing more. They claim and have no more than a public interest in the proceeding. The investigation they suggest would result in no direct benefit to them as individuals. Hence, no appealable interest is present. They are not "parties aggrieved" in the legal

sense. While members of the public may appear and express their convictions or objections in judicial hearings directed at matters of public concern, the right to so appear and be heard does not, in itself, confer the right to appeal an adverse order. In the absence of statutory authority, no one has the right to appeal in proceedings of such a character, unless he is authorized to act in matters relating to "the public welfare," or has some personal right, necessary to be specially protected. This personal right, or beneficial interest, must be distinct from that of the general public and differ therefrom in kind and substance. See, *Easton Transit Company's Petition*, 270 Pa. 136, 112 A. 917 (1921); *Elliot Estate*, 388 Pa. 321, 131 A. 2d 357 (1957); *Ritter Finance Co., Inc. v. Myers*, 401 Pa. 467, 165 A. 2d 246 (1960); *Keystone Raceway Corp. v. State Harness Racing Commission*, 405 Pa. 1, 173 A. 2d 97 (1961); *Kensington Club Liquor License*, 164 Pa. Superior Ct. 401, 65 A. 2d 428 (1949); *Arsenal Board of Trade v. Pa. P.U.C.*, 166 Pa. Superior Ct. 548, 72 A. 2d 612 (1950).

Appeal quashed.

CONCURRING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

On occasion a judge encounters a situation wherein he must yield his belief and opinion on the merits of a controversy in deference to a long settled and well established rule of procedure, a rule to which adherence is requisite if the administration of justice is to be orderly and certain. The case at bar presents such a situation.

A careful scrutiny of the instant record convinces me that the court below should have directed an investigation by a grand jury of the matters set forth in the petition presented to it. Had I been a member of the court below to which this petition was presented,

*without hesitation* I would have granted the prayer of the petition and directed a grand jury investigation. Thus, in many respects, I am in full accord with the views expressed and the conclusions reached in the dissenting opinion of Chief Justice BELL.

However, I believe that, under our decisions and well established practice, the present appellants lack the requisite legal standing to take this appeal. The right of appeal is not universal but confined to parties who are "aggrieved" in the legal sense by an order, decree or judgment of a lower court. Such has been the rationale of our decisions over the years. In my opinion, the present appellants are not "parties aggrieved" in the legal sense and, hence, had no right of appeal. It is, therefore, with reluctance that I conclude that this appeal must be quashed.

---

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur with Justice EAGEN in his determination that appellants have no standing to prosecute an appeal from a denial of their request, as memorialists, for a special grand jury investigation. They are not "parties aggrieved" by the order of the court below, a quality essential to their right of appeal. *Keystone Raceway Corporation v. State Harness Racing Commission,* 405 Pa. 1., 173 A. 2d 97 (1961); *Ritter Finance Co. v. Myers,* 401 Pa. 467, 165 A. 2d 246 (1960). The memorialists appeared before Judge ALEXANDER to "inform" the court of alleged improprieties and to urge, therefore, the appointment of a grand jury. This was no adversary proceeding. The memorialists appear in the same capacity as citizens who come before a court requesting either clemency or the imposition of a severe sentence on a defendant who has been convicted or who has pled guilty. These petitioners, seeking to direct the discretion of the court, have no standing to prose-

cute an appeal when their requests to the court have been denied.

In taking this appeal, appellants have misconceived both the nature of a special charge to a grand jury and the function of a memorial wherein a court is requested to embark upon such a special grand jury investigation.

A grand jury is an arm of the criminal court. It is not an independent governmental body. *Shenker v. Harr, Treasurer, et al.,* 332 Pa. 382, 2 A. 2d 298 (1938). See also *Special Grand Jury Case,* 397 Pa. 254, 154 A. 2d 592 (1959). As declared in *Commonwealth v. Hubbs (No. 1),* 137 Pa. Superior Ct. 229, 241, 8 A. 2d 611 (1939) : "Under our conception of proper criminal procedure, no grand jury is ever considered an independent body; whether engaged in the exercise of its ordinary functions and powers in considering formal indictments laid before it by a district attorney, or in the performance of the special and occasional duty of investigating matters given it in charge by the court, it is still merely an arm of the court and under its control."

In essence, the purpose of a memorial is to invoke the machinery of the court itself to engage, through the medium of the grand jury, in an investigation of the matters alleged. In that undertaking the court does not act as a judicial arbiter to adjudicate issues between contending parties. The proceeding is not an adversary one in the traditional sense of parties litigant seeking judgment of the court. Whether the court should undertake such an investigation is purely within the ambit of judicial discretion.

A memorial is not a pleading. Its presentation neither institutes a legal proceeding, nor does it bring any "parties" before the court. Merely because the court determines specially to charge a grand jury to undertake an investigation gives no right to the memo-

rialists to control the investigation or even participate in it.

It follows that individuals filing a memorial with a court have no standing as litigants. Rather, they are in the position of informers who undertake to bring to the attention of the court matters upon which the court is requested to act, not as a judicial arbiter but as a coordinate branch of government. It is clear beyond doubt that the court's determination specially to charge or not to charge the grand jury is not subject to appeal since there is no litigable controversy. In fact, there is no judicial controversy of any kind. The parties against whom the investigation may be directed cannot appeal therefrom; nor can the memorialists appeal from the determination of the court not to embark upon the investigation.

That this conclusion is inescapable is revealed by an examination of the grand jury cases considered by this court since the establishment of the Commonwealth. *In no case has it come before us by way of appeal. Our jurisdiction has always been invoked by an application for writ of prohibition,* to prevent an alleged improper exercise of power or an abuse of jurisdiction by the court below. *McNair's Petition,* 324 Pa. 48, 187 Atl. 498 (1936), is illustrative. The invariable purpose of these proceedings in our court has been to *prohibit* the court below from proceeding specially to charge the grand jury to embark upon an investigation. And it is significant that almost invariably, the one requisite for special grand jury investigation has been a request by a duly constituted law enforcing official. Despite this, we have repeatedly issued the writ of prohibition to enjoin the special grand jury investigation. *Never in the history of the Commonwealth have we permitted a special grand jury investigation upon a memorial of a non-official group of citizens.* See Ap-

pendix A, a collection of cases compiled by the city solicitor, counsel for appellees.

The writ of prohibition is original process. It is not an appeal to this court.

The counterpart of prohibition is mandamus. *Carpentertown Coal & Coke Co. v. Laird*, 360 Pa. 94, 100, 61 A. 2d 426 (1948). What appellants are really seeking by this appeal is for this court to direct the court of quarter sessions to undertake the investigation through its arm, the grand jury. Therefore, this appeal is in the nature of a mandamus directed to Judge ALEXANDER. But a private party only has a standing to obtain a writ of mandamus if he has a beneficial interest in the outcome of the proceedings distinct from that of the general public. *Mellinger v. Kuhn*, 388 Pa. 83, 130 A. 2d 154 (1957). Appellants herein make no pretense of suffering any injury which is special or peculiar to themselves. On the contrary, they presume to act on behalf of the general public. Hence, appellants cannot qualify for mandamus.

A final and insurmountable obstacle facing appellants is the very nature of a mandamus proceeding. As we held in *Kaufman Construction Co. v. Holcomb*, 357 Pa. 514, 520, 55 A. 2d 534 (1947), ". . . a writ of mandamus . . . may be used only to compel the performance of a purely ministerial or mandatory duty, as, for example, in Hotel Casey Co. v. Ross, 343 Pa. 573, 23 A. 2d 737 . . . It is elementary that it cannot be used to control the exercise of discretion or judgment on the part of a public official or an administrative or judicial tribunal; nor to review or compel the undoing of action taken by such an official or tribunal in good faith and in the exercise of legitimate jurisdiction, even though, in fact, the decision rendered may have been wrong; nor to influence or coerce a particular determination of the issue involved; nor to perform the function of

an appeal or writ of error even though no appeal or writ of error be permitted by law."

Accordingly, the appeal must be dismissed because appellants are not parties to a legal controversy; they are not parties aggrieved; and mandamus cannot be used to control the determination or judgment of a judicial tribunal.

Even if we were to hold improperly that appellants do have standing to prosecute an appeal from the denial of their request for a grand jury investigation, appellants could not prevail.

Appellants presented a memorial to Judge RAY-MOND PACE ALEXANDER sitting in the Miscellaneous Division of the Court of Quarter Sessions of Philadelphia County on June 8, 1961. Following conferences with Judge ALEXANDER, counsel for appellants and counsel for appellees joined in a stipulation providing that if the court should decide specially to charge the grand jury in the matters presented by the memorial, such charge should be presented by Judge ALEXANDER. Thereafter, upon consideration of the stipulation and motion of counsel, the court, acting through the assignment judge, The Honorable FRANCIS SHUNK BROWN, JR., assigned Judge ALEXANDER with authority specially to charge the grand jury in these matters if a decision to so charge should be made by the court. The judges in charge of the June and July, 1961 Grand Juries agreed and consented to the assignment of Judge ALEXANDER in this manner in order that the petitions or memorials might be expeditiously presented with no assignment or administrative conflicts within the court.

A supplemental memorial or petition was presented to Judge ALEXANDER on June 12, 1961. An answer, coupled with a motion to dismiss, was filed by counsel for appellees. A hearing was held by Judge ALEXANDER beginning June 15, 1961 and extending through June 26, 1961. On July 25, 1961, Judge ALEXANDER handed

down his decision in an opinion concluding that a sufficient showing had not been made to warrant the special charging of the grand jury, and denying the request and dismissing the petition or memorial. Thereafter, appellants took an appeal to our court returnable the second Monday of November, 1961.

Counsel for appellants did not request either the court below or this court to hold over the June or July 1961 grand juries pending disposition by our court. Neither did they request that either panel should not be discharged. The terms of both panels have long since expired and both panels have in fact been discharged.[1]

A grand jury may be held in session to continue its investigation after the close of the term for which it was convened. *Shenker v. Haar*, supra. However, here the grand juries of June and July, 1961, have completed their terms and have been discharged. Likewise, the June and July, 1961 terms of the court of quarter sessions have been completed. With the end of the terms, and the discharge of these grand juries, the jurisdiction of Judge ALEXANDER and indeed of the court itself over their deliberations have terminated. Nor is there any authority or precedent, after the expiration of the term of the court, for the reconvening of a grand jury once it has been discharged.[2] It is obvious, therefore, that the appeal is moot and must be dismissed.

The reasons already stated are dispositive of this matter. Unfortunately, the minority opinion does not

---

[1] In Philadelphia, the sessions of the Court of Quarter Sessions are held monthly. Act of March 13, 1867, P. L. 420, §1, 17 PS §471. These are independent sessions for the dispatch of the business of the court.

[2] I express no opinion on the propriety of reconvening *during the term of court, a grand jury which has been discharged.* See *Blakeley's Petition*, 22 Pa. Dist. 221 (1913); *In Re: Grand Jury Investigation*, 25 Erie 301 (1942).

deal with the legal controversy involved, but indulges in a discussion of the facts of the petition which impels further comment.

The prime analytical fallacy in the minority opinion is the contention that, not only was the court below compelled to accept as fact the statements in the memorial, but also that out-of-context excerpts taken from newspaper editorials and articles must likewise be accepted as verity, and this, without reference either to any of the supporting exhibits or to the entire exhibit from which a particular excerpt is quoted. With but one exception, newspaper articles and editorials are attached as the sole support for the averments contained therein. The lone exception is Exhibit 24 of the memorial sub judice—correspondence from former Justice, then Attorney General, ALPERN. This Exhibit 24 definitely sets forth the clear substantive ground mandating refusal of that which the instant proponents deemed it to support.

That the court below was not required to accept as verity any and all material contained in the memorial is clear beyond doubt. When a memorial is presented to a judge requesting him specifically to charge a grand jury, the material thus proffered *may* be considered but obviously is not *required* to be accepted as fact. Even more clearly beyond dispute, the judge to whom the memorial has been presented need not accept the opinions or conclusory statements contained therein. Our court most recently held, and indeed declared, such to be the law. *Special Grand Jury Case,* 397 Pa. 254, 154 A. 2d 592 (1959).

Thus, under both the law and the facts, the lower court's action in denying the memorial was proper.

APPENDIX A

| Name of Case | Citation | Petitioner or Memorializer | Facts Alleged in Memorial Which Requested Convening of Special Grand Jury | Remarks |
|---|---|---|---|---|
| In the matter of the Memorial of the Officers and Directors of the Citizens' Ass'n. | 8 Phila. 478 (1870) | Officers and Directors, Citizen's Ass'n. | Allegation of grievous public nuisance in that the several Passenger Railway Companies failed to repair roads, streets and highways. Denied. | Memorial presented in open court. Dismissed by court acting on its own motion. |
| In re Alleged Extortion Cases | 29 Pa. C.C. 538 (1904) | **Grand Jury** | Alleged extortion of money by public officials from foreign born by commencing criminal action. Denied. | Special presentment dismissed since ordinary crimes were involved. |
| Commonwealth v. Klein | 40 Pa. **Superior** Ct. 352 (1909) | D.A. | Bribery and Corruption in obtaining divers ordinances. Granted. | Proceeding involved appeal of contempt citation by witness who had refused to testify before a special grand jury. |

| Name of Case | Citation | Petitioner or Memorializer | Facts Alleged in Memorial Which Requested Convening of Special Grand Jury | Remarks |
|---|---|---|---|---|
| District Attorney's Petition | 50 Pa. C.C. 347 (1921) | D.A. | Leak in gas main caused by earth subsiding endangering general welfare. Denied. | Memorial dismissed by court on own motion. |
| McNair's Petition | 324 Pa. 48 (1936) | Court on own motion. | Alleged corruption of magistrates. Malfeasance and misfeasance in office. Denied. | Court below on own motion appointed special grand jury but was reversed on appeal by writ of prohibition. |
| Commonwealth v. Hackney | 117 Pa. Superior Ct. 519 (1935) | Court on own motion. | Investigation into conduct of one tax collector. Granted. | Appeal involved motion to quash indictments. Appeal denied. Court did not mention McNair case. |
| Dauphin County Grand Jury Investigation (No. 1) | 332 Pa. 289 (1938) | D.A. | Charges made during political campaign against governor and other public officials. Denied. | Memorial for special grand jury granted in court below, reversed by writ of prohibition on appeal. |

| Name of Case | Citation | Petitioner or Memorialist | Facts Alleged in Memorial Which Requested Convening of Special Grand Jury | Remarks |
|---|---|---|---|---|
| Dauphin County Amended Petition | 332 Pa. 326 (1938) | D.A. | Amended petition to show actual conspiracy, possession of evidence after investigation. Granted. | Refused writ of prohibition as to amended petition. |
| Commonwealth v. Hubbs (No. 1) | 137 Pa. Superior Ct. 229 (1939) | D.A. | Breakdown of law enforcement, gambling, connivance of police. Granted. | Appeal from quashing of perjury indictment. Order affirmed. |
| Shenker v. Harr | 332 Pa. 383 (1938) | D.A. | State of crime and law enforcement in County, particularly gambling. Granted. | Taxpayer's attack on extension of grand jury beyond regular term. Did not question sufficiency of Memorial. |
| Comm. v. Rhey | 140 Pa. Superior Ct. 340 (1940) | D.A. | Divers persons attempting to corrupt jurors. Granted. | Appeal from conviction. Judgments affirmed. |

| Name of Case | Citation | Petitioner or Memorializer | Facts Alleged in Memorial Which Requested Convening of Special Grand Jury | Remarks |
|---|---|---|---|---|
| Phila. County Grand Jury Investigation | 347 Pa. 316 (1943) | Harry K. Butcher | Neglect of duty by members of Registration Commission. Denied. | Memorial granted in court below—reversed on writ of prohibition. |
| Margiotti Appeal | 365 Pa. 330 (1950) | D.A. | Use of City Labor and material by City employees for private endeavor. Granted. | Appeal by Atty. Gen. from refusal of court below to allow Atty. Gen. to supersede Dist. Atty.; Appeal granted permitting supersession by Atty. Gen. |
| Comm. v. Schindler | 170 Pa. Superior Ct. 337 (1952) | D.A. | Numerous violations of gambling laws. Granted. | Appeal of perjury conviction. Superior Court regarded petition as insufficient but sustained perjury conviction. |
| Comm. v. Haines | 171 Pa. Superior Ct. 362 (1952) | D.A. | Alleged alliance between police and other public officials and criminals engaged in lottery. Granted. | Appeal of contempt citation. Reversed contempt citation but held that grand jury was valid. |

| Name of Case | Citation | Petitioner or Memorializer | Facts Alleged in Memorial Which Requested Convening of Special Grand Jury | Remarks |
|---|---|---|---|---|
| Grand Jury Investigation of Western rior State Penitentiary (1953) | 173 Pa. Super Ct. 197 | D.A. | Following prison break, asked court to appoint jury to investigate actual conditions existing. Granted. | Appeal arose out of a refusal of court below to grant petition of Atty. Gen. to limit investigation to criminal acts. Superior Ct. reversed Quarter Sessions in denying petition. |
| Comm. v. Soloff | 175 Pa. Superior Ct. 423 (1954) | Attorney General | Conspiracies to cheat and defraud the City of Pittsburgh, bribery of city officials, noncompliance with statutes requiring competitive bidding, lotteries and house of prostitution operated in knowledge of public officials. Granted. | Appeal of conviction for Aggr. A. & B.; reversed conviction as being beyond scope of investigation of special grand jury. |
| Special Grand Jury Case | 397 Pa. 254 (1959) | D.A. | Certain alleged criminal situations within ranks of union. Denied. | Granted in lower court, reversed on writ of prohibition. |

| Name of Case | Citation | Petitioner or Memorializer | Facts Alleged in Memorial Which Requested Convening of Special Grand Jury | Remarks |
|---|---|---|---|---|
| Petition to reconvene Grand Jury | 13 Pa. D. & C. 2d 575 (1957) | Attorney Gen. | The grand jury at its close levied certain charges against D.A. and Attorney General. D.A. asked for reconvening so D.A. could clear self. Denied. | No compelling emergency. |
| Comm. v. Evans | 190 Pa. Superior Ct. 179 (1959) | Attorney General and D.A. | Conspiracy to cheat and defraud Pa. Turnpike Commission. Granted. | Appeal from conviction on indictments upheld. |
| In Re Grand Jury Investigation of Registration Commission, etc. | 22 Pa. D. & C. 2d 285 (1960) | Committee of Seventy | Investigation of D.A., three City Commissioners and five Registration Commissioners in connection with vote regularities. Denied. | Court found that ordinary legal process was sufficient to cope with only alleged frauds. |

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The questions involved in this appeal are of tremendous importance not only to the citizens of Philadelphia, but likewise to the citizens of each county and municipal subdivision throughout Pennsylvania. A special grand jury proceeding is at times vitally essential for the preservation of law and order and for the protection and the welfare of a community, and sometimes of the entire State. A special grand jury must be pro bono publico. It should not be used as an instrument to further political ambitions or to harass or oppress political foes; on the other hand even if the primary motives of the petitioners be political, that will not suffice to defeat a special grand jury proceeding which is necessary to protect the public interest.

Certain principles of law are well established and these principles must be applied in *every* case, no matter whose ox is gored. The present case has become so infected with and inflamed by politics as to befog the issues, with a resultant misconception and misapplication of the pertinent principles of law. It is therefore necessary to review, and attempt to state with clarity, the principles which are applicable herein, as well as in the consideration and disposition of all future petitions for a special grand jury.

This appeal raises the following very important questions: (1) Can citizens and taxpayers petition for the convening of a special grand jury; (2) what facts, or grounds or causes or averments, and what supporting detail or data are necessary to warrant or compel the convening of a special grand jury; (3) what pleadings and what if any evidence may or must be considered by a presiding Judge in deciding whether to convene a special grand jury; (4) what is the effect of the filing (a) of an answer by respondents which denies most of the material allegations of the petition, and (b) of the respondents' simultaneous motion to dis-

miss the petition; (5) who has the right to appeal from the grant or the refusal of the presiding Judge to convene a special grand jury; and (6) in a consideration and determination of the decision of the lower Court, what are the applicable tests on appellate review? Since these questions are sometimes interrelated, several of them will be considered together and out of order.

### The powers and purposes of a grand jury

The origin of the grand jury, like the origin of trial by jury, is so ancient that it is shrouded in antiquity. A grand jury probably originated in England in the 11th century. The jurors originally decided matters in accordance with their personal knowledge or their knowledge of neighborhood affairs. Later, they summoned witnesses, investigated persons and conditions, made reports to the sovereign, and gradually became an indicting grand jury. Grand juries from ancient times have been a very important and integral part of Anglo-Saxon, and subsequently of American law. They exist first, for the protection of society, secondly, for the indictment of alleged criminals, thirdly, for the investigation of crimes and conditions which have created or are likely to create public harm, and fourthly, to protect from criminal charges innocent persons who have been erroneously or falsely accused of crime. Today, a grand jury is an arm of the criminal court and is the body by which an alleged criminal is (usually) indicted and brought to the bar of justice for trial.

Broadly speaking, there are two kinds of grand juries—(1) an indicting grand jury and (2) an investigating grand jury. A so-called indicting grand jury, which is the ordinary and periodically summoned grand jury, not only indicts alleged criminals for specific crimes, but likewise, at the direction and under the su-

pervision of and subject to the limitations prescribed by the presiding Judge, investigates and hears evidence concerning criminal and other conditions in the community which do or may affect injuriously the public health or safety or welfare or morals.

Ordinary grand juries have made thousands of investigations during the history of this Commonwealth. No one, no matter how innocent and blameless, enjoys being investigated*—it consumes his time and energies; it is likely to cause him anxiety, even though everyone knows that it is not a finding or even an accusation of guilt; and it disrupts, and sometimes seriously disrupts the performance of his business or official duties.

Contrasted with the thousands of investigations conducted by an ordinary (indicting) grand jury, are the relatively few investigations conducted by a special grand jury. Ordinary or indicting grand juries investigate, as we have seen, any and every matter pertaining to crime or to municipal conditions which the presiding Judge orders investigated. The presiding Judge may direct such an investigation when he believes it advisable from information he has received, or from a story or article or editorial in a newspaper or magazine, or from any other source which he believes is reliable. A special grand jury, on the other hand, is convened only when and because the facts and circumstances which are brought to the attention of the Court indicate (1) the existence of widespread corruption, or

---

* Perhaps the most familiar as well as the most widespread practice of investigations is the annual investigation by Federal Revenue agents of a large majority of income taxpayers. Cabinet officers and officials of the Federal Government are frequently summoned and investigated by Senate or House Committees to explain or justify their budget or their official actions or plans, usually for the purpose of possible legislation. Irrespective of one's feelings, a possible investigation is one of the penalties to which every public official must, in the public interest, be subject.

violations of law, or serious crimes, or systematic criminal depredations by public officers, or that a matter of great public importance which is inimical to public interest (riots, etc.) has occurred or is likely to occur; and (2) that it or they will likely injuriously affect the public health, or safety, or morals, or welfare; and (3) that the facts and circumstances alleged were obtained from reliable and trustworthy sources; and (4) that the alleged crimes cannot be readily discovered or coped with by the ordinary legal processes if promptly, vigorously and impartially pursued by the District Attorney. See cases, infra. If a special grand jury discovers criminal conditions which it believes should be corrected, or persons who have committed one or more crimes, it presents its findings and recommendations to the Court for presentation to an indicting grand jury. There are three reasons why a special grand jury is so infrequently invoked: (1) A special grand jury may be in session for a far longer time than the ordinary grand jury, with resultant substantial disruption of the life or business of each juror and substantial financial loss; (2) the cost to the County or to the Commonwealth may be great; (3) the normal functions of Government may be seriously disrupted or retarded. However, its importance in ferreting out and in protecting the community from crimes and criminal conspiracies or from corruption or disorder or disease or similar matters inimical to the public interest is so great, and its protective powers so necessary for the preservation of law and order and honest Government, that its existence and power must never be effectually curtailed or destroyed.

A grand jury, because of its long and well settled power to subpoena witnesses, papers and records, and because of its impartiality and the manner and method by which its deliberations are conducted and the secrecy surrounding them, is a particularly appropriate

and (often) vitally necessary body or instrument to protect the public from criminal misconduct of public officials and from widespread evils.

### Who has the right to petition for the convening of a special grand jury?

A District Attorney and an Attorney General undoubtedly have the right, and citizens and taxpayers as petitioners or memorialists likewise have the right and power to petition the Court for a special grand jury to investigate widespread crime, or corruption by public officials, and other matters above enumerated which are inimical to the health or morals or safety or welfare of the public. See for example *Philadelphia County Grand Jury Investigation Case,* 347 Pa. 316, 32 A. 2d 199, where the Committee of Seventy filed a memorial for a special grand jury.* See also cases, infra.

Moreover, the Constitution, in Article I, §20, provides: "The citizens have a right in a peaceable manner . . . to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance." If the people have a Constitutional right to petition for redress of grievances, surely they should have a right to petition for a grand jury proceeding to protect them from corruption and crime by public officials. Memorialists' right to present this petition is recognized by the lower Court and by the Superior Court and at least impliedly by this Court.

---

* This Court issued a writ of prohibition, not on the ground that the Committee of Seventy had no right or standing to present a memorial for a special grand jury, but on the ground that the petition or memorial did not allege sufficient facts or grounds of criminal misconduct to warrant a grand jury investigation of the registration commission.

### Grounds or averments necessary to warrant or compel the convening of a special grand jury

While individuals are always involved, the *primary objective* of a special grand jury proceeding is to ferret out and discover acts which are or are likely to be harmful to the public, rather than the ordinary prosecution of an individual criminal. Where the allegations which are worthy of belief show overt acts of corruption, bribery, conspiracy or other criminal acts which seriously affect or are likely to injure the public generally, either in the field of health or morals or safety or general welfare, and particularly if they constitute or permit corruption or systematic violations of law or criminal depredations by public officials—a special grand jury is particularly an appropriate proceeding! *McNair's Petition*, 324 Pa. 48, 187 A. 498; *Dauphin County Grand Jury Investigation (No. 1)*, 332 Pa. 289, 2 A. 2d 783; *Margiotti Appeal*, 365 Pa. 330, 75 A. 2d 465; *Special Grand Jury Case*, 397 Pa. 254, 154 A. 2d 592.

In *Special Grand Jury Case*, 397 Pa., supra, the Court said (page 259): "The law on this subject is well summed up in what has become the leading case, McNair's Petition, supra (324 Pa. 48): 'A grand jury investigation, because of the gravity of the undertaking, must have a definite purpose to discover criminal acts which seriously affect or injure the public generally, which effect, if permitted to continue, would endanger public safety or health, demoralize the personal security of members of the public, or permit systematic criminal depredations by public officers. Such matters require immediate attention so that these evils may be suppressed. The criminal acts subject to investigation must be such that the ordinary process of the law is inadequate to cope with or discover them.

" 'A grand jury's investigation cannot be a blanket inquiry to bring to light supposed grievances or wrongs for the purpose of criticizing an officer or a department of government, nor may it be instituted without direct knowledge or *knowledge gained from trustworthy information*\* that criminal conspiracy, *systematic violations of the law* or other criminal acts of a widespread nature\*\* prevail, and at least one or more cognate offenses should exist on which to base a general investigation. The investigation cannot be aimed at individuals primarily, as such, nor at the commission of ordinary crimes. . . .' "—to which should have been added the important remainder of the foregoing quotation—*"but should be of matters of criminal nature wherein public officers or the interests of the general public are involved."*

With this background and in the light of the foregoing authorities, we shall analyze and evaluate the facts and the contentions in the instant appeal.

### What pleadings and what evidence may be considered?

Nine\*\*\* prominent citizens (in two separate petitions) petitioned or memorialized the Court of Quarter

---

\* Italics throughout, ours.

\*\* A grand jury investigation was refused in this case because the allegations involved merely the officers of one union. On the other hand, a special grand jury proceeding was approved to investigate an alleged conspiracy between two officers of Manu Mines Company, two members of the Pennsylvania Turnpike Commission, and several employees of the Commission. This long and costly investigation resulted in the conviction of the aforesaid men of conspiracy to defraud the Commonwealth of several million dollars. See *Commonwealth v. Evans*, 190 Pa. Superior Ct. 179, 154 A. 2d 57. See also *Margiotti Appeal*, 365 Pa., supra.

\*\*\* Dr. Robert L. Johnson, former President of Temple University, Donald C. Rubel, a former Councilman at Large, Walter

Sessions of Philadelphia County, which was then presided over by Judge RAYMOND PACE ALEXANDER, to summon or convene a special grand jury to investigate widespread corruption, bribery, conspiracies and a systematic violation of the criminal laws by certain named public officials which they alleged existed and are occurring in the City, and which were so widespread as to injuriously affect the public welfare and the administration of the City's business. The memorialists were electors and taxpayers of the City acting on behalf of themselves and of the public in general. The respondents were the Mayor of Philadelphia, the District Attorney, the City's Managing Director, the Commissioner of Public Property, the Commissioner of Streets, the Commissioner of Procurement, the Director of Commerce, the Director of Finance, and the President of City Council.

To this petition or memorial and the supplements thereto, the respondents filed (1) answers which (a) flatly denied most of the material allegations and (b) averred that the evils and crimes which were known were being corrected, or investigated by City Officials, and (2) a motion to dismiss. The petitions or memorials made general averments as above noted of corruption, bribery, conspiracies and other crimes, and as part of the petitions attached thereto photostatic copies of newspaper articles which contained, inter alia, factual statements, and confessions by several of the alleged conspirators which (1) supported the averments of the petition, and (2) furnished detailed data, often with names, dates and amounts. The petitioners also averred that the crimes alleged occurred in the aforesaid Municipal Departments of the City with the knowl-

P. Miller, Jr., Robert L. Leonard, Mary Belle Hanson, Mrs. Virginia H. Knauer, City Councilwoman, Wilbur H. Hamilton, John Stewart and M. George Mooradian.

edge, aid and connivance of a number of respondents specifically mentioned therein. The petitioners further averred "that the widespread crime and corruption . . . involving conspiracy, bribery, extortion, fraud, 'payola', corrupt solicitation, misfeasance, malfeasance, nonfeasance and misdemeanors in office on the part of [certain named high as well as minor] public officials." It was specifically averred that these crimes were committed "for the enrichment of themselves [high and minor public officials] and others and of the Democratic City Committee and other Political Committees, all of which seriously affect the public generally, cause a loss of public funds and which now does and if continued will further endanger the public welfare and safety and which have shaken the governmental fabric of the City and have dismayed the citizenry thereof."

From the petition and its exhibits the petitioners informed the lower Court:

That certain high officials of the Department of Public Property, as well as public officials in the Departments of Procurement, of Commerce, of Finance and other departments, "have accepted large bribes, and conspired with others to defraud the City by rigging contracts to make repairs on the Frankford Elevated Transit Line owned by the City, which resulted in faulty repairs, lack of repairs and unnecessary repairs at a loss to the City of from $200,000 to in excess of one million dollars."

That during 1959 and 1960 and within the last two years and within the jurisdiction of the Court, Eli G. Travis gave—and a copy of Travis' written confession was attached—certain named public officials in the Department of Property, in the Department of the City Treasurer, in the Department of Public Procurement, in the Finance Department, money in consideration of their help in obtaining for Travis's company certain contracts for enumerated work.

That, as appeared in a copy of a deposition by Eli G. Travis, in the Sunday Bulletin of May 28, 1961, Travis stated, inter alia, "I figure I paid out at least $75,000 in payola on these el contracts (elevated contracts) . . . . I know Mayor Dilworth better clean his house and clean it awful fast . . . . All I heard was 'gimme, gimme'. 'Hungry' is no name for some of those fellows around City Hall." Travis then mentioned the names of minor public officials to whom he had given money and the amounts.

That the Evening Bulletin published the following statement by two members of the Bulletin Staff, namely, Leonard J. Murphy and Bayard Brunt: "Gift-giving contractor Eli G. Travis said yesterday that when he gave $3,000 in cash to Councilman Victor E. Moore in Moore's City Hall office he thought of it as a 'reward'.

"Travis said that although the sum was termed a 'political contribution', in his mind it actually was a reward for Moore's help in getting a $650,000 appropriation bill through City Council . . . .

"The ordinance to appropriate $650,000—to pay for more repair work on the Frankford Elevated—was introduced into City Council by Moore on May 5 last year. It was signed by Mayor Dilworth on June 16, 1960.

"Moore said he remembered that Travis' $3,000 contribution was the largest single contribution received by his Committee . . . that either he had lost a folder containing the name of Travis and other early contributors, or it had been taken by someone. This, he said, is why he never gave Blasband [treasurer of the Philadelphia Citizens for Kennedy Committee, on which Moore served as co-chairman] a list of these contributors," and that he had not told Hemphill or the District Attorney of Travis' political contribution, in spite of the payola scandal centering around Travis.

That after the newspapers had unearthed bribery and scandals in connection with work on the Frankford elevated, Mayor Dilworth termed them "Penny Ante Stuff"; that, based upon the newspaper discoveries and further investigation by the City Controller, the City has been defrauded of at least $1,800,000 for which the City Solicitor has brought a civil suit.

That leading Philadelphia newspapers reported under date of May 5, 1961, that Alexander Hemphill, Democratic City Controller, accused Donald C. Wagner, Democratic City Managing Director, of blocking the elevated repair probe. We note that this was not a mere political charge by a Republican against a Democrat. This was a charge by a high public official of the Democratic City Administration against a high public official of the same administration.

That in May, 1961, Richardson Dilworth, Mayor of Philadelphia, publicly stated—and a copy of his statement was made part of the record—that "about 1/3 of the members of City Council, department heads and politicians had been putting some pretty sharp pressure on the Civil Service Commission and the Personnel Department"; and "We have been too complacent in assuming that civil service employees could not be reached by bribers."*

"The aforesaid information also demonstrates that despite the advices received by the Mayor aforesaid, and despite his high public office and duty, no action was taken by him to investigate these matters, nor did he instruct the District Attorney, City Solicitor, City Controller, or City Council to investigate these matters, to correct these conditions or to expose and prosecute any wrongdoers. Nor did the Mayor call

---

* We note that Dilworth then pledged that "Our mistakes will be corrected" and "that he would not tolerate crooks and that was why he fired 5 people yesterday" (May 24, 1961).

these matters to the attention of the Judge in charge of the grand jury."

"That certain high officials of the City Government, including the City Council, members of the Democratic Party and members of the Democratic City Committee, have attempted to obtain large sums of money in return for the promise of passage and for the passage of zoning ordinances in the Democratic controlled City Council."

That Michael D'Amato, a Northeast Philadelphia contractor, had charged in an affidavit that Democratic organization officials and City employes tried to shake him down for $2,500 in return for pushing a zoning change through City Council. D'Amato's affidavit further stated that a lawyer named Kenneth L. Stein told him that a named Councilman "wanted the aforementioned $2,500 in cash before the first reading of the zoning bill" because the named councilman and "the boys" had not dealt previously with D'Amato and did not know whether they could trust him. D'Amato, a registered Democrat, said, "I knew they were shaking me down."

That United States Senator Hugh Scott—certainly a highly reputable citizen—in demanding an investigation by a special grand jury publicly asserted "Many sources have advised me that there is a schedule of payoffs for zoning permits and zoning ordinances in Philadelphia; the payoffs ranging from $25 for a permit to as high as $10,000 for a zoning ordinance."

We further note that the independent and preeminent newspapers in the City of Philadelphia, each of which has been a supporter of the present and the prior Democratic city administrations, have repeatedly urged and vigorously demanded a grand jury probe; and that they have repeatedly and vigorously asserted that—because of the political connections of many of the persons allegedly involved and because of the lack

of prompt and proper investigation by City authorities and the widespread belief that if an investigation were made by the District Attorney it could not be impartial—only a special grand jury empowered to subpoena and to question witnesses "could get to the bottom of a mess that becomes more complex with each day"; only a special grand jury "could impartially and successfully investigate and clean up the 'big municipal mess'."

Typical of the sense of outrage which was so often expressed by the aforesaid newspapers is the following excerpt from one of the memorialists' newspaper exhibits.

"Good government in Philadelphia has been dealt a terrible blow by the events and the disclosures of the last few weeks. Cover-up, evasion, innocuous reports and back-slapping votes of confidence at City Hall are not going to repair the damage. A shocked and confused public wants all the facts brought out, in whatever sordid detail is necessary for a genuine clean-up—and a special grand jury, called by the District Attorney for the purpose, would seem the best answer."

Typical likewise, are the following editorials—which were included in the memorialists' many exhibits—by Philadelphia's leading newspapers:

"WANTED IN PHILADELPHIA (Evening Bulletin 6-7-61).

"There is a man missing in the deep woods of Philadelphia's municipal scandals.

"The missing man is a fearless, honest, politically-uncompromised investigator and prosecutor. If Philadelphia had such a man—or group of men—petty payola, rigged contracts, suspicious political 'contributions' could be uncovered in an orderly way, with assurance to the public that the accused would be swiftly prosecuted.

"Instead, Philadelphia has this unsettling setup: . . .

"It has a Mayor (Democrat) who came back to find his reputation at stake and acted swiftly to try to put his administrative house in order. But Mayor Dilworth's office renders him incapable of acting as a detached investigator.

"It has a District Attorney (Democrat) who is moving (if that is the word) with the greatest caution imaginable. District Attorney Crumlish has consistently given the impression that if someone would present him with a prima facie case on a silver platter, he might prosecute. Maybe, that is.

"It has a City Council (Democratic by 15-2) now under the gravest cloud because of the accusation that $650,000 worth of El contracts were pushed through it, to the benefit of a man who says he 'rewarded' one Councilman by a $3,000 political contribution.

"And Philadelphia knows all this chiefly through non-official investigation. Facts were lying all over the place, but only newsmen were able to see them. Official investigators seem to have seen only what they wanted to see.

"Could this be because only the newsmen are not hog-tied to the Democratic Party? Philadelphians need not be very cynical to ask that. Politically, this is an all-Democratic mess—City Hall, Council, Democratic fund-raisers. Politically this is an all-Democratic probe.

"Democrats can investigate themselves fearlessly, of course. But are they doing it?

"The missing man is wanted, in Philadelphia."

"DEMOS GET WORD ON SCANDAL: SHH (Daily News 6-6-61).

"Democratic City Councilmen have been given orders to make no statements about the current City Hall-PTC payola scandal in which the names of two councilmen have appeared.

"The Councilmen have been instructed to refer all queries to the Democratic City Committee.

"Carroll Shelton, the committee's publicity director, said newsmen would have to submit questions in writing to councilmen and that these would be screened by the committee. Answers will be given to all news media simultaneously.

"Shelton said he was acting for Green."

"A POLITICAL GAG ON COUNCIL (Philadelphia In-Inquirer 6-6-61).

"The gagging by the Democratic City Committee of the Democratic members of City Council, and the Councilmen's meek submission to the silencing edict, are among the most shocking developments yet produced in the current wave of scandals at City Hall.

"The Councilmen have been given orders to make no statements, to grant no interviews and to answer no reporters' questions concerning the fraud and payola charges, but to refer all queries to the Democratic City Committee.

"The Committee's publicity director said that questions would have to be submitted in writing to the Councilmen and that these would be screened by the City Committee, which would issue the answers simultaneously to all news media.

"The Philadelphia public has a very vital question which it would like to have answered and it is not going to submit it in writing to the Democratic City Committee or its boss, Bill Green. It is this: *What is the Democratic Organization afraid of?*"

We cite the foregoing editorials, articles and exhibits to *demonstrate that these were not political charges by leaders of the Republican Party, but the sincere belief of leading citizens with no partisan or ulterior motives and with no axe to grind; and they came from reliable and trustworthy sources whose only*

*desire is to protect and insure good, honest government in Philadelphia!*

Petitioners further averred:

". . . that the specific crimes and matters hereinbefore referred to in this paragraph are part of a system of related crimes and depredations past, present and continuing, which involve a wide-spread system of bribes, gifts and schedules of payments to high public officials, high Democratic party officials and to Democratic political committees in connection with the passage of zoning ordinances.

". . . that the aforesaid crime and corruption on the part of persons known and unknown, does not lend itself to detection and proof by the ordinary agencies of law enforcement and that the public interest will suffer unless the prayer of this Petition is granted."

That "District Attorney James C. Crumlish, Jr. [and] Attorney General Anne X. Alpern, [have] failed and refused to act despite adequate staff with which to do so.

"City Controller Alexander Hemphill despite initial activity has failed to make further investigation or to pursue any action with respect to alleged political contributions.

"City Council, which has power of investigation given to it by the Home Rule Charter, has wilfully refused to act."

Many more averments, illustrations, additions, and exhibits with respect to other city officials and employees in many city departments could be recited, but the foregoing will amply suffice to demonstrate that *an investigation by a special grand jury is imperatively needed* and that the ordinary processes of the law have already proved to be inadequate to cope with the situation.

What pleadings and what evidence may be
considered by a presiding Judge?

The decision to grant or refuse the convening of a
special grand jury lies within the discretion of the pre-
siding Judge, subject, of course, to appellate review.
See infra. His decision must be based upon (1) the
petition, including the exhibits attached thereto and
made a part thereof, and (2) matters, if any (a) with-
in the common knowledge of the people of the City or
community involved, and (b) within the judicial knowl-
edge of the Court which has been acquired in the course
of its official duties. His decision cannot be based on
denials by the respondents, or *on exculpatory or new
facts* which are stated by respondents in an answer to
the petition, or in their written or oral argument:
*Dauphin County Grand Jury Investigation Proceedings
(No. 1),* 332 Pa. 289, 2 A. 2d 783; *Dauphin County
Grand Jury Investigation Proceedings (No. 2),* 332 Pa.
342, 2 A. 2d 804. The questions properly before the
Court in the present proceeding were (1) whether the
factual averments in the petitions and exhibits, plus
such matters of common knowledge or within the
Court's judicial knowledge (if there were any such) —
including the averred and well known inactivity of the
District Attorney—were sufficient or insufficient (a)
to warrant, or (b) to compel the convening of a special
grand jury, and (2) whether the factual averments in
the petitions and exhibits were obtained from reliable
and trustworthy sources.

Errors of the Lower Court

The presiding Judge allowed (as above mentioned)
the respondents not only to file an answer denying the
general and specific averments of widespread corrup-
tion and crime, but likewise permitted the Mayor, the

District Attorney and the City Controller—although represented in accordance with the provisions of the City Charter by the City Solicitor, who ably argued in their behalf—to personally argue their defenses and to vigorously oppose a special grand jury. Regrettably the presiding Judge allowed the respondents to support their legal arguments by what they alleged were facts, which contravened the facts alleged in the petition and in the record. Even more regrettably, the presiding Judge incorporated in and based (his opinion and) his decision to refuse a grand jury investigation to a large extent upon the *new facts* which were averred by respondents in their answers and stated in their oral argument, which was allegedly an argument on the legal points involved! The Court in its opinion said: "They [the petitions] are not pleadings in the ordinary sense and the rules applicable to ordinary civil pleadings do not necessarily apply. *Therefore, the answers which have been filed of record, the exhibits, the statements and arguments made in open court, as well as other matters which have been brought to the attention of the court are, and must be given full consideration.*" This is contrary to established practice; it is unsupported by any prior decision; *and it is not and never has been the law.*

If this were the sole error of the lower Court, it constituted such basic fundamental error as to require a reversal and a remand for a reconsideration and a de novo redetermination of the question of convening or refusing to convene a special grand jury*—without

---

* The necessity for a remand and a redetermination—*as a minimum*—is made even more *imperative* by the Petition of Wilbur Hamilton and Virginia Knauer, filed March 19, 1962, for remand to the lower Court in light of newly discovered evidence. This evidence consisted of a confession of a former Democratic Ward leader, John J. Fitzpatrick, who, until recently, was Sergeant-at-Arms of City Council, which corroborated and supplemented in

any consideration or adoption of the facts alleged in the answers or in the legal arguments of respondents.

This is such a fundamental basic principle of law that no authority need be cited to support it. However, if any authority is needed, it can be found in *Dauphin County Grand Jury Investigation (No. 1)*, 332 Pa. 289, 331 et seq., 2 A. 2d 783. In that case *this Court sustained an amended petition by a district attorney for a special grand jury* and dismissed a petition by the Governor and the Attorney General for a writ of prohibition even though (1) the District Attorney's petition was based upon charges which were made in the heat of a primary campaign; (2) even though the charges were vehemently denied by the Governor and his accused cabinet; (3) even though the reliability and trustworthiness of the petitioner was vehemently attacked; and (4) even though the Governor averred that the District Attorney was attempting to perpetrate a fraud on the Court.

The amended petition of the District Attorney alleged that the Governor of Pennsylvania and five named cabinet officers, and other high ranking public officials, had conspired together and had committed overt acts of conspiracy, extortion, blackmail and bribery. The petition alleged an overt act as a part of the system of related crimes which it was necessary for the grand jury to investigate.

The Governor, in his amended petition for a writ of prohibition *specifically denied* for himself and all other

---

detail (with names, dates and amounts) the factual averments and charges (which were made in Petitioners' original memorial and the supplements thereto) of Councilmanic bribery and corruption with respect to zoning and other legislation. Furthermore, the necessity for a remand and a redetermination of the petition for a special grand jury proceedings is demonstrated weekly by the public charges and confessions with respect to corruption in which public officials are allegedly involved.

persons each and all criminal charges alleged. The Governor further averred that the District Attorney's amended petition *was a deliberate attempt to perpetrate a fraud,* that his conduct was actuated by political and other improper motives, that the averments in the petition were false and libelous, and that the petition was merely a fishing expedition. The Governor also averred that he did not oppose an investigation of any State officer or employee by and under the direction of an impartial officer. This Court, we repeat, sustained the petition for a special grand jury and said that while it was impressed with the sincerity of the Governor's statements, it could not, in view of the facts alleged in the petition, grant the writ of prohibition. However, since the Governor's petition for a writ of prohibition denied not only the truth of the averments but also the reliability and trustworthiness of the sources upon which the District Attorney based his allegations, and likewise challenged the honesty and good faith of the District Attorney, this Court remanded the record to the lower Court "for such consideration as that Court deems just. Rule discharged and writ of prohibition refused."

In *Dauphin County Grand Jury Investigation Proceedings (No. 2),* 332 Pa. 342, 2 A. 2d 804, the further proceedings are well summarized (page 343): "After the petition of the Governor and the Attorney General for a writ of prohibition was refused and the record was remanded to the court below for further proceedings, SCHAEFFER, P. J., specially presiding in the court below, after concluding that an investigation was necessary, made an order directing that the grand jury be convened."

Once again the power of the Court to order a special grand jury investigation was sustained in spite of the Governor's answer hereinabove set forth; and the petition of a Committee of the House of Representatives

for a writ of prohibition—which Committee had been authorized to undertake the investigation of the above-mentioned charges against the Governor and his cabinet—was dismissed.

These cases utterly refute the contentions of the respondents (a) that the averments in their answer are sufficient to support a refusal to convene a special grand jury, or (b) that they can be considered in the Court's determination of whether, based upon the petitions for a special grand jury, such a grand jury can be convened. We note further that the facts and charges of bribery, corruption, conspiracy and crime which were averred in the amended petitions of the District Attorney in the *Dauphin County Grand Jury Investigation Proceedings* were substantially the same as the facts and charges of bribery, corruption, conspiracy and crime which were averred in the petitions in the present proceeding, and that the respondents' answers were even stronger in the Dauphin County proceedings than the answers in the instant proceeding.

It is contended that no important person was indicted or convicted as a result of the *Dauphin County Grand Jury Investigation Proceedings*. This is both inaccurate and irrelevant. In the District Attorney's amended petition several members of the Governor's Cabinet, and others, were accused of conspiracy and other crimes and at least two Cabinet members were indicted. *One of the advantages of a special grand jury proceeding and one of the customary results is that the investigation which is made by a special grand jury is the ferreting out of crimes and criminals which the ordinary processes of the law cannot discover or cope with!* However, in the *Dauphin County Grand Jury Investigation Proceedings* aforesaid, Roy E. Brownmiller, who was Secretary of Highways and a member of the Governor's Cabinet, was specifically charged with conspiracy and other crimes in the Dis-

trict Attorney's *amended* petition. The special grand jury in its report to the Court stated that it found Brownmiller guilty of unlawful conduct in another matter and recommended that his conduct be considered by the regular grand jury. Accordingly Brownmiller was indicted by the ordinary or indicting grand jury for this new crime which was discovered and reported by the special grand jury, and was convicted and sentenced to imprisonment. These facts clearly appear in the voluminous record of that proceeding, and are briefly referred to in Judge BALDRIGE's opinion on Brownmiller's appeal, *Commonwealth v. Brownmiller,* which is reported in 141 Pa. Superior Ct. 107. Judge BALDRIGE in his Opinion said (page 109):

"Pursuant to the orders of the Dauphin County Court of Quarter Sessions, an investigation of the conduct of certain public officials, *including Roy E. Brownmiller,* was conducted by the *September 1938 grand jury.* Upon the conclusion of its *investigation* the grand jury made a *presentment* to. the court of quarter sessions that it found Brownmiller had been guilty of unlawful conduct in his office and recommended that the matters *therein reported* should be considered by the regular current grand jury.

"That was done and the *January 1939 grand jury* returned an indictment against Roy E. Brownmiller containing three counts."

The record further shows that Brownmiller moved to quash the indictments because of alleged improper activities before the *investigating grand jury;* his motion to quash was dismissed; and his conviction (as well as that of two insurance men) was affirmed.

Furthermore, the facts and general charges of bribery, conspiracy and crimes averred in the present petition were in substantially the same language as the facts and general charges of bribery, conspiracy and crimes alleged in the petition of the Attorney General

(joined in by the District Attorney) in petitioning for a special grand jury proceeding in the Manu-Mine investigation which produced the indictments against and conviction of two members of the Turnpike Commission and several members of Manu-Mine. Cf. *Commonwealth v. Evans*, 190 Pa. Superior Ct. 179, 154 A. 2d 57.

If the lower Court believed that the facts averred in the petitions and particularized in the exhibits came from reliable and trustworthy sources, it unquestionably had the power and discretion not only to convene a special grand jury, but where as here the factual averments so clearly indicated and portrayed widespread corruption and crime by certain city officials, the convening of a grand jury was absolutely imperative! In no event could the Court base its refusal to convene a special grand jury on *facts* which were derived from respondents' answer or from their legal argument.

Even though this is an extraordinary proceeding, it is still a legal proceeding and while the summoning of a grand jury lies within the sound discretion of the Court of Quarter Sessions, nevertheless, it is well settled law as stated in *Philadelphia County Grand Jury Investigation Case*, 347 Pa. 316, 326, 32 A. 2d 199: "Judicial discretion requires action in conformity with law upon the facts and circumstances before the court after hearing and due consideration."

### Newspaper statements of fact, articles and editorials

Are newspaper statements, editorials, articles and reports admissible, and if so, what weight and value are to be given them? Newspaper statements, editorials and reports have not only been held admissible but sufficient to warrant a grand jury investigation. Cf: *Margiotti Appeal*, 365 Pa., supra; *Commonwealth v.*

*Schindler,* 170 Pa. Superior Ct. 337, 86 A. 151; *Commonwealth v. Klein,* 40 Pa. Superior Ct. 352; *In re Duties of Grand Jury,* 27 Pa. C. C. 288; *Bucks County Grand Jury,* 24 Pa. C. C. 162.

In *Margiotti Appeal,* 365 Pa., supra, Mr. Justice (later Chief Justice) HORACE STERN, after reciting certain facts, said (page 334) : "A public agitation thereupon began for an official investigation of the probable extent to which city employes and officials had been criminally appropriating to their own use property of the city and labor of its employes, in violation of their public trust. The local newspapers published vigorous articles and editorials demanding such a probe and calling on the District Attorney to act through the medium of a grand jury investigation; civic organizations made similar demands, and both they and the newspapers began vehemently to criticize the inaction of the District Attorney and to suggest that the Attorney General's office should take matters in hand."

Although the District Attorney had filed a petition for a Special Grand Jury, this Court allowed the Attorney General to supersede the District Attorney and to conduct the special grand jury proceeding because of "his [the District Attorney's] apparent failure to proceed with the alertness, the zeal, the vigor and the aggressiveness which the situation so obviously required. . . ."

This last quotation is equally applicable to the inactivity of the District Attorney as averred in the petition and as supported by common knowledge and judicial records.

In *Commonwealth v. Schindler,* 170 Pa. Superior Ct. 337, 86 A. 2d 151, the District Attorney's petition stated " 'That it has come to the attention of your petitioner, by means of newspaper articles and from other sources that there are numerous violations of gambling laws. . . .' "

In *Commonwealth v. Klein*, 40 Pa. Superior Ct., supra, that Court approved a grand jury investigation which was ordered upon the District Attorney's petition which stated, inter alia, "That it has been *publicly asserted in the public prints* of the city of Pittsburg and elsewhere, that bribery has been resorted to. . . ."

*In re Duties of Grand Jury*, supra, Judge LINDSAY took Judicial notice of the fact that the National Guard, called by the Governor, arrived at the depot in Warren County and was jeered and assaulted with stones. He said: "I am speaking of what was the common and general report and *what appeared in the public press*. It therefore becomes a matter of such *public notoriety* as, in the judgment of the court, to call for a thorough investigation by the grand jury."

In *Bucks County Grand Jury*, supra, President Judge YERKES charged the Grand Jury: "We have all had our attention [called to] . . . bribery and corruption at the primary and general elections . . . . That such corruption threatens and is being practiced . . . has been *so boldly charged in the newspapers* of the day as to leave no doubt of its *public notoriety,* thereby casting upon you the duty of inquiry. *It is commonly asserted* that . . . . An *influential newspaper* . . . names persons, amounts and occasions, with an assurance of accuracy that is intended to carry conviction to the minds of the most obtuse or sceptical."[*]

Independent newspapers are today the principal watchdogs and protectors of honest, as well as good government. They are, more than any one else, the principal guardians of the general welfare of the community, and with few exceptions they serve the community with high principles, zeal and fearlessness. They

---

[*] President Judge YERKES did not charge the jury to enter upon a full investigation at that time because it was on the "eve of an election."

are "pro bono publico." Although their opinions and editorials are often of great value, it is unnecessary to decide what weight if any is to be given to them in this case, even though they express the beliefs of the people of Philadelphia, except those who are blindly partisan or politically ambitious. It will suffice to say that when based upon the *facts* which they have unearthed and fearlessly reported in this matter, and especially when the facts are publicly presented at a time when there is no political election or campaign, the factual statements made by these independent newspapers (1) are matters which come from a reliable and trustworthy source; (2) they are entitled to great weight; and (3) together with the other averments in the petitions, they undoubtedly demonstrate the necessity for a special grand jury!

Who has a right to appeal?

There is no case in Pennsylvania which expressly decides who has a right or standing—whether he be a District Attorney or an Attorney General or a private citizen, or the subjects of the proposed investigation— to appeal from the grant or refusal of a special grand jury proceeding. However, the same result has been obtained by impliedly permitting a District Attorney or an Attorney General to appeal, or by expressly permitting citizen-memorialists, as well as persons who may be affected or harmed by a grand jury investigation (a) to petition for a writ of prohibition or (b) to challenge the validity of a special grand jury.

See: *Special Grand Jury Case,* 397 Pa., supra; *Philadelphia County Grand Jury Investigation Case,* 347 Pa., supra; *Dauphin County Grand Jury Investigation (No. 1),* 332 Pa., supra; *McNair's Petition,* 324 Pa., supra; *Commonwealth v. Klein,* 40 Pa. Superior Ct., supra; *Grand Jury Investigation of Western State*

*Penitentiary,* 173 Pa. Superior Ct. 197, 96 A. 2d 189; *Margiotti Appeal,* 365 Pa., supra; *Commonwealth v. Hackney,* 117 Pa. Superior Ct. 519, 178 A. 417; *Commonwealth v. Hubbs (No. 1),* 137 Pa. Superior Ct. 229, 8 A. 2d 611; *Shenker v. Harr,* 332 Pa. 382, 2 A. 2d 298; *Commonwealth v. Rhey,* 140 Pa. Superior Ct. 340, 14 A. 2d 192; *Commonwealth v. Haines,* 171 Pa. Superior Ct. 362, 90 A. 2d 842; *Commonwealth v. Schindler,* 170 Pa. Superior Ct., supra; *Commonwealth v. Soloff,* 175 Pa. Superior Ct. 423, 107 A. 2d 179; *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 154 A. 2d 57; *Commonwealth v. Brownmiller,* 141 Pa. Superior Ct., supra.

If the petitioners have, as they have, a standing in the lower Court to petition for a grand jury proceeding, they should have a right and a status *in a matter such as this,* to appeal to this Court from the refusal of the lower Court to convene a special grand jury. Not only is there no statutory or decisional prohibition against their right to appeal, but *it is imperative that such right exist in order to adequately protect their community.* Were it otherwise, a District Attorney *—if he were of a complacent nature, or lazy, or incompetent, or mistaken about the law or his powers or duties, or motivated primarily by political considerations,—could with impunity refuse to petition for, and a Judge with similar traits could refuse to convene a special grand jury, no matter how great and widespread were the alleged crimes and corruption nor how great the necessity for such an investigation. If such were the law, law-abiding citizens of the community would in such instances have absolutely no redress or protection.

---

* We are well aware of the fact that an Attorney General *under some circumstances* has a right to supersede a District Attorney, but the same result would follow if the Attorney General were complacent, or too busy, or incompetent or mistaken about his powers or the law, or motivated primarily by political considerations.

The question of corruption, bribery, conspiracies and other crimes alleged to have been committed by certain named public officials and by named and unnamed Councilmen, and by several named and unnamed leaders of the Democratic Committee and the Democratic Party, has been, we repeat, so engulfed in and inflamed by politics, and the failure of the District Attorney to make any timely investigation of crimes allegedly committed by his political associates, has been so glaringly apparent that only the blindly partisan or the politically naive could believe that a full and fair and impartial investigation could now be made by the District Attorney without the aid of a special grand jury. In the meantime, the Statute of Limitations is running, witnesses have a way of disappearing, or forgetting exactly what occurred, and crime may go undetected or unpunished because, in the words of Justice (later Chief Justice) STERN in *Margiotti Appeal,* 365 Pa., supra, the District Attorney has failed "to proceed with the alertness, the zeal, the vigor and the aggressiveness which the situation so obviously required."

### Respondents' Contentions

Respondents in their answer and in their arguments admit that several crimes were committed, particularly with reference to the Frankford Elevated Project, but deny all the other alleged crimes. Moreover, they add (a) that officials in the City Departments allegedly involved are investigating the charges which were made, (b) that several persons who took bribes have been indicted for the crimes allegedly committed, (c) that the newspaper articles are insufficient to support a grand jury proceeding, (d) that the other allegations in the petition were too general and vague, and (e) that the motives of the petitioners are political.

These contentions furnish, as above pointed out, no adequate answer or defense. After many months of

inactivity and silence on the part of many Councilmen and many of the City officials allegedly involved, less than half a dozen persons (including several minor officials) have been indicted. It is apparent that after all this time, only the surface has been scratched. The fact that a *civil* suit for over $1,800,000 has been brought against the Philadelphia Transportation Company by the City Solicitor arising out of the fraud and the bribery alleged in the petition with respect to the Frankford Elevated, cannot absolve the proper City authorities from the duty of prompt, thorough, fair and impartial investigations of *all* the corruption and *all* the alleged crimes, and from the duty of bringing criminal indictments whenever the facts require. A civil suit is neither a legal excuse nor a legal justification for failure by the District Attorney, with the aid and cooperation (if obtainable) of other high City officials,* *to promptly, fully and impartially ferret out* all the corruption, frauds, payola, conspiracies and other crimes which were averred in the petitions and the supplemental petitions, and to forthwith criminally prosecute all persons who are guilty of crime.

Respondents alleged that the motives of the petitioners were political. Even if this were so, it would be like a pot calling the kettle black. In nearly every case where a special grand jury is sought, those persons who are or may be investigated and accused contend that the motives of the petitioner were political and consequently the Court should refuse to convene a special grand jury. This contention is well answered by President Judge Rhodes in *Commonwealth v. Evans,* 190 Pa. Superior Ct., supra, on page 261: "the motive for instituting [criminal] proceedings is not a relevant consideration . . . except as it bears on credibility . . .

---

* It is difficult to believe that all the public officials who were accused of corruption, bribery and crime would cooperate with and aid an active prosecuting officer to investigate themselves.

A defendant cannot escape criminal liability, where the evidence indicates guilt, on the basis that the motive of the prosecutor may have been other than the proper administration of justice." See to the same effect the *Dauphin County Grand Jury Investigation* cases, supra. Moreover, we repeat, this is nothing but a smoke screen—the *independent newspapers* in their discovery of corruption and crime and in their demands for a grand jury investigation, *could not justifiably be considered as motivated by politics.*

The respondents argue and the lower Court held as a matter of judicial knowledge that Philadelphia in the last ten years has made great physical and cultural progress,* and that to subject the Administration of the City to a grand jury investigation in this case would do *irreparable* harm to the City's name and reputation. I disagree with this contention. I believe that all Philadelphians can be justly proud of the renaissance which has occurred in parts of our City, but it is irrelevant to the basic questions and issues here presented. Moreover, while a grand jury investigation of any administration, or mere charges of crime and corruption, may temporarily tarnish a City's reputation, after a grand jury investigates and absolves the innocent, or the guilty have been convicted, the air will be cleared and cleansed of all accusations of widespread corruption and crime, and Philadelphia's reputation will be enhanced and will shine more brilliantly than before.

I would hold that the lower Court (1) based its decision on a misconception of the applicable basic principles of law, and likewise (2) committed a manifest and palpable abuse of discretion. I would hold that a special grand jury investigation is, on the record in this

---

* This is a matter of common knowledge, rather than judicial knowledge.

case, *imperatively needed!* I would therefore reverse the Order of the lower Court and remand the record to the Court below, with directions to convene a special grand jury to investigate and report their findings and recommendations with respect to the important material allegations of widespread corruption, bribery, conspiracy and other crimes which are set forth in the petitions and the supplementals.

Mr. Justice O'BRIEN joins in this dissenting opinion.